UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JACOB GLENN BLANKENSHIP                                                    Plaintiff

v.                                                    Civil Action No. 3:23-cv-235-RGJ-CHL

LOUISVILLE-JEFFERSON COUNTY
METRO GOVERNMENT, KENTUCKY
and ELLIOT YOUNG                                                          Defendants

* * * * *

## MEMORANDUM OPINION & ORDER

In this Section 1983 case, plaintiff Jacob Glenn Blankenship ("Blankenship") claims that defendants Louisville-Jefferson County Metro Government ("Metro") and Kentucky State Police ("KSP") trooper Elliot Young ("Young") (together "Defendants") unlawfully deprived him of his free speech, free exercise and due process rights. [DE 1 at 14–21]. All parties now move for summary judgment.[1] [DE 52; DE 55; DE 58]. The motions are fully briefed. [DE 69; DE 70; DE 71; DE 74; DE 75; DE 76; DE 77; DE 78]. For the following reasons, Blankenship's motion for summary judgment [DE 58] is **DENIED**. Defendants' motions for summary judgment [DE 52; DE 55] are **GRANTED**. Additionally, Blankenship's motion to exceed the page limit [DE 49] and motion to withdraw [DE 67] his motion to seal are **GRANTED**. His motion to seal [DE 57] is **DENIED as moot**. Metro's motion to seal [DE 53] is **DENIED**. Defendants' motions in limine [DE 89; DE 91] are **DENIED as moot**.

---

[1] "A party filing a motion must also file a separate proposed order." LR 7.1(e). Blankenship has submitted many proposed orders as standalone docket entries. While a proposed order must be a "separate" document, it may be filed as an attachment to the corresponding motion. For a response opposing a motion, no proposed order is required.

# I. BACKGROUND

The Kentucky Derby took place at Churchill Downs on May 7, 2022. Blankenship and others visited the area to share a religious message. They ultimately stopped to preach near a sidewalk which, per an event permit granted by Metro, was under Churchill Downs' authority. At Churchill Downs' direction, Young arrested Blankenship for trespass.

## A. The Event Permit and Setup

The Kentucky Derby is a thoroughbred racing event held at Churchill Downs each year on the first Saturday in May. [DE 59-3 at 865]. In preparation for the 2022 event, Churchill Downs submitted to Metro a "Special Event Permit Application" to assist it in handling the 340,000 expected attendees throughout Derby Week.[2] [DE 55-3 at 481]. The application requested a "permitted area" surrounding the racetrack at 700 Central Avenue. [*Id.* at 481, 489–500]. The application's "Security and Traffic Control Plan" proposed restricting access to many streets around Churchill Downs. [*Id.* at 473]. Specifically, the plan called for temporary fencing to close "Central Avenue (Southern) Sidewalk" from Taylor Boulevard to Floyd Street. [*Id.* at 476, 487, 491]. The application also called for a "ticketed area" within the permitted area:

> [T]he southern Central Ave sidewalk closest to Churchill Downs Racetrack will be restricted to ticket holder access only from 4th Street to 9th Street. Guests may be required to show valid ticket at a designated checkpoint.

[*Id.* at 498]. Private security would "handle first point of contact for non-criminal matters," while on-duty KSP troopers would serve as law enforcement. [*Id.* at 483, 487].

Metro approved Churchill Downs' application. [DE 59-3 at 865]. The "Event Permit" confirmed that there would be "restricted access" on "Central Ave from Taylor Blvd to Floyd

---

[2] The Louisville/Jefferson County Metro Government Code of Ordinances establishes Metro's permitting scheme. *See* Metro Code § 100.01 *et seq.*, *available at* https://codelibrary.amlegal.com/codes/louisvillemetro/latest/loukymetro/0-0-0-37016.

Street." [DE 55-4 at 502]. The permit also reflected the closure of sidewalks along that same stretch of Central Avenue. [*Id.* at 503]. However, the permit did not specifically address Churchill Downs' plan to designate a ticketed area within the permitted area.

On or before May 7, green signs were placed on either side of the southern Central Avenue sidewalk. Above Churchill Downs' name and logo, the signs read:

NO TRESPASSING

VALID CREDENTIALS ONLY
BEYOND THIS POINT

CONSENT TO SEARCH OF
PROPERTY OR PERSON
BEFORE ENTERING

[DE 55-5; DE 59-5; *see also* DE 62 at 12:51:20]. These signs were placed near the southwest corner of Central Avenue and Third Street, roughly one block outside the ticketed area as proposed in Churchill Downs' permit application. [*See* DE 55-3 at 498]. However, according to Metro, Churchill Downs was free to set the ticketed area anywhere within the permitted area; Churchill Downs' authority was the same inside and outside the ticketed area. [DE 59-3 at 868–69]. According to Josh Ball, Churchill Downs' security director, public access to the ticketed area was "restricted," while access to the rest of the permitted area was not. [DE 52-3 at 270–71; DE 52-4 at 275]. KSP leadership understood that, under the event permit, Churchill Downs had authority over the permitted area; could limit access to the permitted area; and could trespass individuals within the permitted area. [DE 55-7 at 534–36; DE 71-1 at 1013, 1016].

### B. Blankenship's Activity and Arrest

On Derby Day, Blankenship and others gathered in a parking lot near Churchill Downs. [DE 62 at 11:31:44, 12:05:07].[3] With signs, sound equipment, cameras, and other supplies, they headed south down Third Street towards the event. [*Id.* at 12:18:10]. Blankenship projected his voice with a megaphone as they walked. [*Id.* at 12:22:08]. The group encountered a temporary fence at Central Avenue and traveled east along the northern sidewalk. [*Id.* at 12:34:30; *see also* DE 55-3 at 499]. They eventually made their way through a tunnel under Central Avenue, reemerged on the southern sidewalk, and headed west towards Churchill Downs. [DE 62 at 12:42:15; *see also* DE 55-3 at 499]. Then they crossed Third Street and continued beyond Churchill Downs' green signage on either side of the sidewalk.[4] [DE 62 at 12:51:20; *see also* DE 55-5; DE 59-5.] They stopped between Third Street and Fourth Street to continue engaging with individuals in that area. [*Id.* at 12:51:57; *see also* DE 59-1 at 856]. Blankenship passed the megaphone to another preacher and began offering "tracks" to passers-by. [DE 62 at 12:55:01, 12:57:54].

Several minutes later, someone in a uniform approached the preachers. [*Id.* at 13:08:32]. On Blankenship's bodycam footage, the individual can be seen pointing away from Churchill Downs and can be heard telling the preachers, "y'all gotta go . . . you're trespassing . . . ." [*Id.* at 13:08:35]. As a second uniformed individual approached, one preacher spoke with them. [*Id.* at 13:08:42, 13:09:06]. Blankenship recognized that the individuals were security guards. [DE 55-8

---

[3] Blankenship wore a bodycam on the day in question. [DE 55-8 at 642]. All parties have conventionally filed copies of that footage. [DE 54; DE 56; DE 62]. At this stage, for events "largely captured" by video, the Court accepts "the facts as depicted by the recording" but still "construe[s] any remaining 'gaps or uncertainties' in the footage" against the moving party. *Jones v. Naert*, 121 F.4th 558, 562 n.1 (6th Cir. 2024) (quoting *Heeter v. Bowers*, 99 F.4th 900, 910, 912 (6th Cir. 2024)); *see also Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

[4] Blankenship does not claim that he had a ticket or any other credential allowing him to access the ticketed area. Metro and Young do not claim that, on Derby Day, anyone proactively checked individuals in the ticketed area for valid credentials.

at 646]. He discouraged the other preachers from engaging with them; instead, a second preacher joined the conversation. [DE 62 at 13:09:33, 13:09:50]. The second security guard told the preachers, "You can go on the other side . . . all you want." [*Id.* at 13:10:36]. Then both security guards left the conversation but stayed nearby and observed. [*Id.* at 13:10:40].

Speaking with Joseph Estephane, another preacher, Blankenship remarked, "This is a sidewalk and this is a right-of-way, so we don't have to listen to them. . . . Don't even entertain them. They're not cops." [*Id.* at 13:11:26]. When Estephane told Blankenship that one day earlier, KSP troopers had threatened him with trespass, Blankenship responded, "I'll talk to them when they get here." [*Id.* at 13:11:36]. "I don't even—most of the time, I won't even talk to security officers," Blankenship explained. [*Id.* at 13:24:38]. When a supporter stopped by to offer the preachers encouragement and advice [*Id.* at 13:27:20], Blankenship took a similar tack: "Just ignore that guy. . . . I'm not listening to anybody but the cops. Okay. I don't care what this guy says." [*Id.* at 13:35:55]. "I don't move for anybody unless a cop directly threatens me to move. I'm not moving." [*Id.* at 13:38:58]. "The only way they could close this off is if they were taking tickets. . . . We can go right up to the gate and preach, technically." [*Id.* at 13:39:42].

Blankenship took a second turn with the group's megaphone. [*Id.* at 13:51:42]. At one point, a woman and Blankenship argued and appeared to strike each other; she fell to the ground. [*Id.* at 14:04:25]. "Hey cops! She just assaulted me right here," Blankenship projected with the megaphone. [*Id.* at 14:04:32].

Eventually, Ball contacted Major Matt Johnson, KSP's commanding officer for the event. [DE 55-7 at 522]. According to Johnson, Ball "directed" KSP to Fourth Street and Central Avenue because of "several groups of personnel within the permitted restricted areas that were refusing to leave." [*Id.* at 555–56]. According to KSP Captain Jeremy Smith, security detail commander, Ball

requested KSP's assistance in removing the preachers from the area. [DE 71-1 at 1013, 1016–17, 1030]. Johnson confirmed with Ball that Churchill Downs personnel had already instructed the preachers to leave. [DE 55-7 at 556–57]. After arriving on-scene, he reconfirmed the same with the security guards. [*Id.* at 558]. He also called for more KSP troopers. [*Id.* at 553–55]. Several, including Young, gathered nearby. [DE 62 at 14:13:29]. According to Smith, around this time, Ball personally approached the preachers and spoke with them. [DE 71-1 at 1009]. By this point, Young understood that the preachers were removable because they were remaining in the ticketed area after Churchill Downs had instructed them to leave. [DE 55-2 at 391–92, 401, 407].

The troopers approached Blankenship and the other preachers. [DE 62 at 14:18:12]. Estephane was swiftly detained.[5] [*Id.* at 14:18:18; *see also* DE 59-10 at 930]. One trooper stated, "You're trespassing. You can leave now or you go to jail." [DE 62 at 14:18:24]. Another reiterated directly to Blankenship, "You can leave, or you're gonna go like him—right now," gesturing towards Estephane. [*Id.* at 14:18:35]. Blankenship stated, "I'll leave," but he also continued arguing with troopers over whether the area was "closed off to the public." [*Id.* at 14:18:30]. Young arrested him. [DE 55-2 at 407]. The other preachers left. [DE 62 at 14:18:48; *see also* DE 55-7 at 545]. According to Blankenship, the preachers other than Estephane and himself "kept preaching somewhere else." [DE 55-8 at 699].

Blankenship was cited for third-degree criminal trespass with Young listed as the charging officer. [DE 59-6]; *see also* Ky. Rev. Stat. § 511.080(1) ("A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."). State court records reflect that the charge was dismissed without prejudice and that Blankenship is to have no unlawful contact with Churchill Downs. [DE 55-10].

---

[5] According to Estephane, Churchill Downs and KSP had already warned him the day before about trespassing. [DE 59-10 at 928–29].

### C. Procedural History

Blankenship filed suit in May 2023.[6] The complaint claims under 42 U.S.C. § 1983 that Metro and Young unlawfully deprived Blankenship of his free speech, free exercise, and due process rights. [DE 1 at 14–21]. The complaint also raised a "false arrest" claim against Young. [*Id.* at 19]. Blankenship seeks monetary, injunctive and declaratory relief. [*Id.* at 22–26].

Young moved to dismiss the false arrest claim, as well as Blankenship's other claims insofar as they raised official-capacity claims against him. [DE 11]. Metro moved to dismiss the entire complaint for lack of standing. [DE 22]. The Court found that Blankenship's complaint alleged sufficient facts to establish standing; that Blankenship maintained no official-capacity claims against Young; and that Young had probable cause to arrest Blankenship, entitling him to qualified immunity. [DE 30 at 164–65, 173]. Accordingly, any official-capacity claims against Young and the false arrest claim have been dismissed. [*Id.* at 174].

## II. STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law[,]' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations but must view the evidence

---

[6] In Kentucky, Section 1983 claims face a one-year limitations period. *Bullock v. City of Covington*, 698 F. App'x 305, 306–07 (6th Cir. 2017) (citing *Bonner v. Perry*, 564 F.3d 424, 430–31 (6th Cir. 2009)). Blankenship's complaint was filed one year and one day after the events in question. [DE 1 at 1–2]. It is unclear from the complaint whether Blankenship's Section 1983 claims were timely filed. *See Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008).

and draw all reasonable inferences in a light most favorable to the non-moving party. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"This standard does not change when the parties present cross-motions for summary judgment." *Safety Specialty Ins. Co. v. Genesee Cnty. Bd. of Commissioners*, 53 F.4th 1014, 1020 (6th Cir. 2022). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "Cross-motions . . . do not mean . . . that one of the motions must be granted." *Reform Am. v. City of Detroit, Michigan*, 37 F.4th 1138, 1147 (6th Cir. 2022). However, they "do authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (cleaned up).

### III. ANALYSIS

To succeed under Section 1983, Blankenship must show that someone "acting under color of state law" deprived him of "a right 'secured by the Constitution or laws of the United States.'" *Littler v. Ohio Ass'n of Pub. Sch. Emps.*, 88 F.4th 1176, 1180 (6th Cir. 2023) (quoting *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003)). Blankenship invokes his constitutional rights of free speech, free exercise, and due process. [DE 1 at 14, 16, 21]. His remaining claims are as-applied challenges of Metro's permitting scheme. [*Id.*].

#### A. Free Speech

This claim "depends on three inquiries: (1) whether speech is protected; (2) 'the nature of the forum' in which the speech occurs; and (3) whether the government's restriction on speech satisfies the relevant forum's associated constitutional standard." *Hartman v. Thompson*, 931 F.3d

471, 478 (6th Cir. 2019) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). Metro and Young do not dispute that Blankenship's speech was constitutionally protected. *Compare with Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015). At issue are the nature of the area where Blankenship was arrested and whether Defendants' restrictions of his speech survive constitutional scrutiny.

### 1. *Nature of the Forum*

Young arrested Blankenship on the southern sidewalk of Central Avenue, between Third Street and Fourth Street, while Churchill Downs' event permit was in effect. Blankenship claims he was arrested outside the ticketed area because, while Churchill Downs' "no trespassing signs" were placed at Third Street, its earlier permit application stated that the ticketed area's boundary would be at Fourth Street. [DE 58 at 729, 735]. Yet the permit application did not irrevocably dictate where the ticketed area must be. In fact, the event permit granted by Metro did not address the ticketed area at all. [*See* DE 55-4]. Metro allowed Churchill Downs to form, within the permitted area, whatever ticketed area it deemed appropriate. [*See* DE 59-3 at 868–69]. It is the unrebutted testimony of Churchill Downs that on Derby Day, its green signs set the ticketed area's boundary. [DE 76-1 at 1153]. Metro [DE 71-2 at 1102], KSP leadership [DE 55-7 at 562; DE 71-1 at 1020–21], and Young [DE 55-2 at 385–86] all shared in that understanding. There is no genuine dispute that Blankenship was arrested in the ticketed area.

### i. *Types of Forums*

"Courts recognize four types of fora: (1) the traditional public forum, (2) the designated public forum, (3) the limited public forum, and (4) the nonpublic forum." *Brindley v. City of Memphis, Tennessee*, 934 F.3d 461, 467 (6th Cir. 2019); *see also Pleasant Grove v. Summum*, 555 U.S. 460 (2009). Public streets are "the archetype of a traditional public forum." *Brindley*, 934 F.3d at 467 (quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)). "The government creates a

designated public forum when it opens a piece of public property to the public at large, treating as if it were a traditional public forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). The government "may 'create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects.'" *Id.* at 534–35 (quoting *Summum,* 555 U.S. at 470).

The parties dispute whether a traditional public forum, such as Central Avenue's southern sidewalk, can *ever* be reduced to designated or limited public forums. Blankenship argues it cannot. [DE 78 at 1179]. But as Metro correctly notes [DE 74 at 1121], the Sixth Circuit has not answered the question—at least in any precedential decision. *See Spingola v. Vill. of Granville*, 39 F. App'x 978, 983 (6th Cir. 2002) ("The designated speaking area within the festival perimeters, though comprised of public streets, is not serving in that function during the festival."). In fact, the Sixth Circuit has expressly reserved the issue.[7] *Parks v. City of Columbus*, 395 F.3d 643, 650 (6th Cir. 2005) (discussing *Bishop v. Reagan-Bush '84 Comm.*, 819 F.2d 289 (6th Cir. 1987)); *see also Bays*, 668 F.3d at 821 ("Whether a municipality has the power to transform a traditional public forum into a limited or nonpublic forum is an open question.").

Blankenship argues that the entire permitted area, including the ticketed area, remained a traditional public forum despite Churchill Downs' event permit. [DE 58 at 732; DE 70 at 980–81]. He points to *Parks*, where "the streets remained a traditional public forum notwithstanding the special permit that was issued to" an event-holder. 395 F.3d at 652. But that event took place *on* a closed public road; it was also free and open to the public.[8] *Id.* at 645, 652. By contrast, the

---

[7] In some similar cases, defendants have simply conceded that the relevant area was a traditional public forum. *E.g. Bible Believers*, 805 F.3d at 235, 242 (free public event on closed streets); *Bays v. City of Fairborn*, 668 F.3d 814, 821 (6th Cir. 2012) (festival at public park); *McGlone v. Metro. Gov't of Nashville*, 749 F. App'x 402, 403–05 (6th Cir. 2018) (permitted area containing a ticketed area).

[8] Blankenship also frames event permits for "exclusive" and "non-exclusive" uses as critically distinct. [DE 70 at 980–81; DE 77 at 1171]. Any distinction appears to come from the facts in *Parks*, not free speech jurisprudence. *See* 395 F.3d at 645 ("The permit is non-exclusive, which, according to the testimony of a

permitted and ticketed areas at issue here were sanctioned to provide a thoroughfare for the Kentucky Derby on Churchill Downs' private property.

Young appears to suggest that the relevant area was a nonpublic forum. [DE 71 at 993]. He points to *Sistrunk v. City of Strongsville*, where the Sixth Circuit upheld a content-based restriction at a free ticketed event. 99 F.3d 194, 196 (1996). But critically, that plaintiff's speech was at odds with the event-holder's *own* "expressive activity." *Id.* at 198. The event was a political rally; the organizer was not required "to *include* discordant speakers" in the event. *Id.* (discussing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995)) (emphasis in original). Meanwhile, Churchill Downs' permitted area was not intended to facilitate any "expressive message" at all. *Cf. Parks*, 395 F.3d at 651 (Organizing an arts festival "is not an expressive message, but merely a purpose for the event.").

Metro recognizes that Blankenship "was arrested on what would normally be a traditional public forum" but notes that "at the time . . . that area was restricted to only ticketholders." [DE 74 at 1123]. Metro argues, therefore, that the area was a limited public forum. [*Id.* at 1122–23]. Metro cites *Hartman*, where the Sixth Circuit found that an area "inside the Fairgrounds in a parking lot" was a limited public forum. 931 F.3d at 479 (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981)). The facts in *Hartman* are nearest to this case. Still, it appears likely that those fairgrounds, unlike the area at issue here, were physically inaccessible without paying admission. *See id.*

It is unclear whether Blankenship was arrested in a traditional public forum or limited public forum. But the distinction is not always pivotal. *Saieg v. City of Dearborn* involved an

---

special events coordinator for the City, means that 'it is for free events open to the public.'"). The distinction certainly did not resonate with Metro's or Churchill Downs' representatives in this case. [*See* DE 59-3 at 876–77; DE 58-4 at 845]. Whether Churchill Downs' event permit was "exclusive" or "non-exclusive" is not determinative here.

annual festival that was "free and open to the public." 641 F.3d 727, 730 (6th Cir. 2011). The festival's attractions were contained to an "inner perimeter," while an "outer perimeter" managed traffic and crowds. *Id.* at 730–31. All of this was on city blocks. *Id.* "The parties disagree[d] about whether the streets and sidewalks within the inner and outer perimeters were functioning as traditional public fora or limited public fora during the Festival." *Id.* at 734 (internal footnote omitted). The Sixth Circuit found that the issue ultimately "[wa]s not germane to the free speech issue in th[at] case." *Id.* As the court noted, "if a rule is content-neutral, then the appropriate test is intermediate scrutiny, even when the rule governs speech in a traditional public forum." *Id.* (cleaned up); *see also Spingola*, 39 F. App'x at 983.

In short, if the restriction of Blankenship's speech was content-neutral, it makes no difference whether Blankenship was arrested in a traditional or limited public forum. *See Saieg*, 641 F.3d at 734 (citing *Phelps–Roper v. Strickland*, 539 F.3d 356, 361–62 (6th Cir. 2008)); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020) ("[C]ontent-neutral laws are subject to a lower level of scrutiny.").

## ii. *Content Neutrality*

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal citation omitted). This means "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics. On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *McCullen v. Coakley*, 573 U.S. 464, 480 (2014) (quoting *Ward*, 491 U.S. at 791). "The question in such a

case is whether the law is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)).

In *Reform America v. City of Detroit, Michigan*, organizers "devised a surrounding 'restricted area' to protect the candidates and ensure order" near a political debate. 37 F.4th 1138, 1143 (6th Cir. 2022). The restricted area encompassed several city blocks. *Id.* at 1144. To enter the area, "media credentials or tickets" were required. *Id.* Some ticketless protestors were turned away. *Id.* at 1143–45. To argue that excluding them was content- and viewpoint-based, they only pointed to their own speech. *Id.* at 1148. The Sixth Circuit rejected that argument and found no genuine issue over whether the defendants had excluded the protestors based on the contents of their speech. *Id.* at 1149. "Both sides *agree*[*d*] that the sole requirement for entry into the restricted area was possession of a ticket," and the protestors "never even *tried* to secure the relevant tickets." *Id.* (emphases in original). The Sixth Circuit further found "no genuine dispute that the group's lack of tickets was the true basis for officers' denial of its entry into the restricted area." *Id.* "[O]fficers excluded *all* members of the public from the restricted area if they lacked the relevant credentials." *Id.* (emphases in original).

This case resembles *Reform America*. While Blankenship claims that "[o]nly the preachers were told to leave" [DE 70 at 982], the record reveals the opposite. Johnson testified that KSP also ejected a ticketless group of dancers. [DE 55-7 at 545–47, 597]. The permitted area was a thoroughfare. Churchill Downs did not check all individuals in the ticketed area for valid credentials, but neither did it allow anyone to linger there unnecessarily. [DE 76-1 at 1154]. Johnson also testified that Blankenship would not have been arrested had he moved "100 feet down that way," meaning outside the ticketed area. [DE 55-7 at 597–98]. Indeed, Blankenship's bodycam footage shows performers, sign-holders, and others engaging in expressive activity

outside the ticketed area. [DE 62 at 12:47:34, 12:50:52, 12:50:35]. Blankenship speculates, without any evidence, that Churchill Downs and KSP "banish[ed]" him because of how others might have reacted to his preaching. [DE 58 at 738–39]. But Young's unrebutted testimony is that he did not arrest Blankenship because of his message. [DE 55-2 at 438–40]. As Young understood it, Blankenship's offense was lingering in the ticketed area after being told to leave. [*Id.* at 391]. There is no genuine dispute that Blankenship and others were excluded for their lack of tickets. *Bays*, 668 F.3d at 821. "Because officers' sole criterion for admission to or exclusion from the [ticketed] area—whether an individual had a ticket—was content neutral, defendants' incidental burden on plaintiffs' speech merits only intermediate scrutiny." *Reform Am.*, 37 F.4th at 1149.

On this point, *Saieg* is analogous as well. There, a rule limiting a preacher's distribution of literature to a stationary location was a content-neutral "regulation of the places where some speech may occur." 641 F.3d at 735 (quoting *Hill v. Colorado*, 530 U.S. 703, 719 (2000)). Here, restricting the permitted area (including the ticketed area) for Kentucky Derby ingress and egress had no more than an incidental effect on where speech might occur. Furthermore, that effect was not even disproportionate for different types of speech. *See McCullen*, 573 U.S. at 480; *cf. Green v. United States Dep't of Just.*, 111 F.4th 81, 103 (D.C. Cir. 2024) ("A trespass law undoubtedly affects some expressive conduct . . . . But trespassing is not 'necessarily associated with speech,' because laws prohibiting trespass also 'apply to strollers, loiterers, drug dealers, roller skaters, bird watchers, soccer players, and others not engaged in constitutionally protected conduct.'").

In short, because the restrictions of access to the permitted and ticketed areas served purposes unrelated to the content of speech, those restrictions were content-neutral. The purpose of establishing the permitted area—facilitating ingress and egress for Churchill Downs—can be justified without reference to the content of any speech. *See McCullen*, 573 U.S. at 480; *Ward*, 491

U.S. at 791. Accordingly, Blankenship's free speech claim calls for intermediate scrutiny. *Reform Am.*, 37 F.4th at 1149; *Saieg*, 641 F.3d at 735.

### 2. *Intermediate Scrutiny*

"[A] content-neutral time, place, or manner restriction can survive intermediate scrutiny if defendants make three showings." *Reform Am.*, 37 F.4th at 1149. (1) "[T]he restricted area must have served a 'significant governmental interest'"; (2) "it must have been 'narrowly tailored' to that purpose, meaning that the restriction survives so long as the governmental interest 'would [have been] achieved less effectively' in its absence"; and (3) "it must have left open 'ample alternative channels for communication.'"[9] *Id.* (quoting *Ward*, 491 U.S. at 791, 799).

#### i. *Governmental Interests*

The government's asserted interests must be more than "important in the abstract." *Saieg*, 641 F.3d at 736–37 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)). "[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron*, 452 U.S. at 650–51. Metro puts two interests in play: (1) ensuring Derby-goers would not congest roads for others and (2) safety for those within the large crowds around Churchill Downs. [DE 74 at 1123–24].

"Public safety and security against potential violence are no doubt significant governmental interests." *Reform Am.*, 37 F.4th at 1149–50. Blankenship argues that an appeal to public safety "does not justify restricting speech when there is no evidence whatsoever of any safety issue." [DE

---

[9] Regarding constitutional scrutiny, Blankenship presents an extra argument: he complains that Metro's "permitting scheme grants unbridled discretion to permittees." [DE 58 at 745]. But the authorities he presents involved facial challenges of ordinances and a criminal statute; only some involved speech rights. [*See id.* at 744–45]. Those cases do not support his as-applied free speech claim [*see* DE 1 at 14], which only challenges the law as enforced against him. *See Green Party of Tennessee v. Hargett*, 791 F.3d 684, 691 (6th Cir. 2015).

78 at 1181]. The Sixth Circuit has already rejected the idea that it takes "call[] in advance to specifically threaten the event" to legitimize this governmental interest. *Reform Am.*, 37 F.4th at 1150. "[V]irtually any large, high-profile event . . . carries with it the risk for violence, whether or not law enforcement has some specific tip . . . . To hold that law enforcement could not establish a restricted area around such an event without a known, specific threat would make it essentially impossible to guard against terroristic violence . . . ." *Id.* Here, hundreds of thousands of individuals visited Churchill Downs during Derby Week, and 160,000 attendees were expected on Derby Day. [DE 55-3]. Certainly, with these crowds traveling through the area surrounding Church Downs, Metro's interests in traffic management and public safety were significant. *Compare with Bays*, 668 F.3d at 822–23.

## ii. *Narrow Tailoring*

At this step, "in the context of intermediate scrutiny as applied to a content-neutral time, place, or manner restriction, [courts] simply ask whether the state would have achieved its asserted interest 'less effectively absent the regulation.'" *Reform Am.*, 37 F.4th at 1151 (quoting *Ward*, 491 U.S. at 799). Here, "the restricted area satisfies that standard." *Id.* As Metro notes, Churchill Downs' safety and security plan is what provided measures for handling massive crowds around Churchill Downs. [DE 76 at 1147]. Implementing that plan would not have been possible without the event permit issued under Metro's permitting scheme. And without an event plan in place, Derby Day crowds would have been essentially unmanaged at least up to the borders of Churchill Downs' private property. Metro could not have conceivably achieved its interests as effectively without permitting the safety and security plan's temporary measures.

## iii. *Alternative Channels for Communication*

The question here is "whether the proffered alternatives allow the speaker to reach [his] intended audience." *Reform Am.*, 37 F.4th at 1151 (quoting *Contributor v. City of Brentwood*, 726

F.3d 861, 865 (6th Cir. 2013)). On Derby Day, access along Central Avenue was restricted from Taylor Boulevard to Floyd Street—not just within the ticketed area. [DE 55-4 at 502]. Metro is correct that, if Blankenship had moved a half-block east when instructed, he would have had ample opportunity to communicate with the same audience. [DE 74 at 1127]. Individuals in the ticketed area necessarily passed through the broader permitted area as well. Given the temporary fencing throughout the permitted area, there is no question that Blankenship would have encountered virtually all of the same individuals he encountered in the ticketed area. [*See* DE 62 at 12:51:20]. No evidence supports Blankenship's contention that "he would only have been able to reach a smaller number of people" outside the ticketed area. [DE 58 at 743]. In fact, common sense suggests that if anything, he would have encountered *more* individuals where both ticketholders and non-ticketholders were traveling. The broader permitted area and nearby unrestricted areas were available to Blankenship. *Cf. Reform Am.*, 37 F.4th at 1151. Most of his fellow preachers took advantage of those alternative channels.

\* \* \*

In sum, while it is unclear whether Blankenship was arrested in a traditional or limited public forum, there is no question that the restrictions of his speech were content-neutral. Those restrictions survive intermediate scrutiny. The ticketed area was narrowly tailored to serve Metro's significant interests in traffic control and public safety. It also left open ample alternative channels for Blankenship to share his message with essentially the same audience. Accordingly, on Blankenship's free speech claim, Metro and Young are entitled to judgment as matter of law.

### B. Free Exercise

Blankenship hardly distinguishes his two First Amendment claims. [*See* DE 58 at 731–32]. While "the Free Exercise and Free Speech Clauses of the First Amendment . . . work in tandem," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022), such claims call for different modes

of analysis. A non-neutral policy which burdens one's sincere religious practice will face strict scrutiny. *Id.* at 525 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). However, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531 (citing *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990)). "A rule of general application . . . is one that restricts religious conduct the same way that 'analogous non-religious conduct' is restricted." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480 (6th Cir. 2020) (quoting *Lukumi*, 508 U.S. at 546).

As Blankenship explains, he challenges Metro's "permitting scheme" with this claim, not Kentucky's trespass statute. [*See* DE 70 at 984]. But nowhere does he allege that the permitting scheme "was enacted with the intent of discriminating against religion." *Clark v. Stone*, 998 F.3d 287, 305 (6th Cir. 2021). The purpose of Metro's permitting scheme is not to infringe upon or restrict religious practices. *See id.* at 304 (citing *Lukumi*, 508 U.S. at 533). The ticketed area restricted Blankenship's preaching no differently than it restricted non-religious conduct. *See Monclova Christian Acad.*, 984 F.3d at 480.

The Supreme Court "ha[s] never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith*, 494 U.S. at 878–79. It was not unconstitutional to prohibit Blankenship from doing what no one else was permitted to do—linger in the ticketed area without a ticket. *Id.* at 879–80 (discussing *Prince v. Massachusetts*, 321 U.S. 158, 171 (1944)). Because the ticketed area's restrictions only incidentally effected Blankenship's preaching, on his free exercise claim, Metro and Young are entitled to judgment as matter of law.

### C. Due Process

"A vague ordinance violates the Constitution in two significant respects: such an ordinance fails, (1) to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct, and (2) to establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)). "With respect to the first goal . . . '[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 551 (6th Cir. 2007) (quoting *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391 (1925)). "With respect to the second goal . . . 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.'" *Id.* (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972)). Where "the law interferes with the right of free speech . . . a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Blankenship claims that Metro's permitting scheme is void for vagueness, but his arguments on this point are scant and less than clear. For example, while his complaint raises an as-applied challenge of the permitting scheme [DE 1 at 21], his motion cites and discusses facial challenges [DE 58 at 746]. *See Flipside, Hoffman Ests.*, 455 U.S. at 497 (noting that to be "unduly vague" "on its face," a law must be "impermissibly vague in all of its applications"). In any event, Blankenship's claim bears two fatal defects.

First, Blankenship has not asserted any property or liberty interest for this claim. "An individual 'must establish that he . . . has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause' to raise a void-for-vagueness challenge to a statute." *West v. Kentucky Horse Racing Comm'n*, 972 F.3d 881, 892 (6th Cir. 2020) (quoting *Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018)) (cleaned up). Because Blankenship has not tethered his due process void-for-vagueness claim to any liberty or property interest, it fails as a matter of law. *E.g. id.*; *see also Fouts v. Warren City Council*, No. 23-1826, 2023 WL 6467366, at *4 (6th Cir. Oct. 4, 2023).

Second, Blankenship simply was not subjected to the law he challenges. For Derby Day, Churchill Downs was the permit applicant and event-holder, not Blankenship. Metro's permitting scheme neither forbid nor required any action of Blankenship, and it did not threaten him with any offense. *Belle Maer Harbor*, 170 F.3d at 556; *Cleveland Fire Fighters*, 502 F.3d at 551. This case is distinguishable from those where groups or individuals *subject to* permitting schemes, such as parade restrictions, have challenged such schemes as unconstitutionally vague. *E.g. Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608–09 (6th Cir. 2005). On Blankenship's due process claim, Metro and Young are entitled to judgment as matter of law.

### D. *Monell* Liability

To hold a municipality liable under Section 1983, a plaintiff "must show (1) that [he] suffered a constitutional violation and (2) that a municipal policy or custom directly caused the violation." *Hardrick v. City of Detroit, Michigan*, 876 F.3d 238, 243 (6th Cir. 2017) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–92 (1978)); *see also Lozman v. Riviera Beach*, 585 U.S. 87, 95 (2018). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Metro and Blankenship dispute whether any policy, practice, or custom renders Metro liable in this case. [DE 52-1 at 247; DE 69 at 965]. "There can be no liability under *Monell* without an underlying constitutional violation." *Chambers v. Sanders*, 63 F.4th 1092, 1101 (6th Cir. 2023) (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). Here, because Blankenship's rights were not violated, there is nothing to hold Metro liable for. *See Naji v. City of Dearborn, Michigan*, 120 F.4th 520, 525 (6th Cir. 2024) (citing *Gaddis ex rel Gaddis v. Redford Township*, 364 F.3d 763, 777 (6th Cir. 2004)). There is no need to reach *Monell* analysis's second step. Metro is entitled to judgment as a matter of law.

### E. Qualified Immunity

"Qualified immunity is an affirmative defense that protects public officials, in certain circumstances, from liability for civil damages when they violate a person's constitutional rights." *Barton v. Neeley*, 114 F.4th 581, 587 (6th Cir. 2024) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Young invokes qualified immunity here. [DE 55-1 at 353]. To overcome this defense, Blankenship must show that (1) Young violated his constitutional rights and (2) those rights were "clearly established" at the time. *Naji*, 120 F.4th at 523 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts may address these questions in either order. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024) (citing *Pearson*, 555 U.S. at 236). "If the answer to either question is 'no,' then the official is entitled to qualified immunity." *Id.* (citing *Ashcroft*, 563 U.S. at 735).

For two reasons, Young is immune to Blankenship's remaining claims.[10] First, as discussed above, Blankenship's rights were not violated. There is nothing to hold Young liable for; it is

---

[10] Young construes Blankenship's First Amendment claims as "retaliation" claims, which would be the norm for such claims against an individual officer. [DE 55-1 at 350–51]. But Blankenship insists he "has not brought a claim for retaliation." [DE 70 at 981].

unnecessary to address whether Blankenship's rights were clearly established.[11] *Naji*, 120 F.4th at 523. Second, the Court has already found that Young had probable cause to arrest Blankenship and therefore was immune to his false arrest claim. [DE 30 at 173]. Young now argues he "is entitled to qualified immunity on Plaintiff's remaining claims for the same reasons." [DE 55-1 at 355]. Blankenship responds that the Court "only found qualified immunity as to [his] false arrest claim." [DE 70 at 978.] That is true, but Young did not move to dismiss Blankenship's other individual-capacity claims. [*Compare* DE 11 at 63, *with* DE 55-1 at 356]. Because Young had probable cause to arrest Blankenship, he is immune to Blankenship's claims. *See Novak v. City of Parma, Ohio*, 33 F.4th 296, 304 (6th Cir. 2022). Young is entitled to judgment as a matter of law.

### F.  Motion to Exceed Page Limit

In this district, "[m]otions . . . may not exceed 25 pages without leave of Court." LR 7.1(d). Blankenship moves to exceed this limit [DE 49] regarding his 32-page motion for summary judgment [DE 58]. Because neither defendant opposes Blankenship's motion, it is granted.

### G.  Motions to Seal

In July 2024, the parties reported that Churchill Downs was unwilling to provide certain nonparty discovery without confidentiality measures in place. [DE 43]. The Magistrate Judge entered a confidentiality order. [*See* DE 45]. Any party filing Churchill Downs' purportedly confidential information was to do so provisionally under seal, *accord.* LR 5.6(c), then "immediately" notify Churchill Downs. [DE 46 at 219]. Churchill Downs would have 14 days to respond and ask the Court to permanently seal the relevant docket entries. [*Id.*]. Of course, Churchill Downs remained able to waive these protections at any time. [*Id.* at 220].

---

[11] Likewise, there is no need to address Young's arguments that Blankenship cannot maintain his claims against him for nonmonetary relief [DE 75 at 1132–33] and that Blankenship's due process claim simply does not implicate him [DE 55-1 at 353].

The Sixth Circuit has long recognized a "strong presumption in favor of openness" regarding court records. *Rudd Equipment Co. v. John Deere Construction & Forestry Co.*, 834 F.3d 589, 593 (6th Cir. 2016) (citing *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)). In determining whether to seal records, the Court considers the nature of the public's interest in the litigation's subject matter, whether the information sought to be sealed is required by statute to be maintained in confidence, and the privacy interests of innocent third parties. *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305, 308 (6th Cir. 2016). "Reference to a stipulation that allows a party to designate certain documents as confidential is not sufficient grounds to establish that a document, or portions thereof warrants filing under seal." LR 5.6(c).

There are two motions to seal. Blankenship initially moved to seal four exhibits, as well as his motion for summary judgment which discusses those exhibits. [DE 57]. Now he moves to withdraw that motion. [DE 67]. According to Blankenship, Churchill Downs does not object to those documents joining the public record. [*Id.* at 955–56]. Metro moves to seal an exhibit which contains portions of Churchill Downs' permit application. [DE 53]. Per Metro, "sealing them is required by Churchill Downs." [*Id.* at 320]. However, the permit application is already part of the public record. [*See* DE 55-3]. It is also one of Blankenship's exhibits which Churchill Downs does not oppose unsealing. [*See* DE 58-1]. Churchill Downs has not responded to any of these motions or otherwise asked the Court to permanently seal any docket entries.

Nothing before the Court overcomes the strong presumption that any of this case's provisionally sealed docket entries should be made public. *See Rudd Equipment*, 834 F.3d at 593. All of them, including Metro's motion to seal itself [DE 53], will be unsealed.

### H.  Motions in Limine

Metro moves in limine to exclude six categories of evidence and argument from trial. [DE 89]. With his own motion in limine, Young joins Metro in five of its six arguments. [DE 91]. Blankenship responded. [DE 99]. In light of the Court's ruling on Defendants' motions for summary judgment, their motions in limine are moot.

### IV. CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

- Blankenship's motion for summary judgment [DE 58] is **DENIED**. Metro's motion for summary judgment [DE 52] is **GRANTED**. Young's motion for summary judgment [DE 55] is **GRANTED**.

- Blankenship's motion to exceed the page limit [DE 49] is **GRANTED**.

- Blankenship's motion to withdraw [DE 67] his motion to seal is **GRANTED**, and his motion to seal [DE 57] is **DENIED as moot**. Metro's motion to seal [DE 53] is **DENIED**. The Clerk of Court shall unseal Docket Entries 53 and 58, as well as their attachments.

- Metro's motion in limine [DE 89] is **DENIED as moot**. Young's motion in limine [DE 91] is **DENIED as moot**.

The Court will enter separate judgment.

Rebecca Grady Jennings, District Judge
United States District Court

December 6, 2024